We have three cases for argument today. We'll begin our session by hearing from the appellants in the Strickland case. Good morning. May it please the court, Judge Wynn, Judge Floyd and Judge Harris, my name is Mary Lynn Tate. It's my honor to represent Kim Strickland, administrator and mother of the decedent Aaron Cooper, whose death is the subject of this case. At the time Aaron Cooper was murdered on July 28, 2011, Robert Gleason was serving a life sentence in the Commonwealth of Virginia for murder. Also at that time, he had just been in court for a second murder. He murdered his roommate, cellmate at Wallens Ridge Prison, also in southwest Virginia. He was incarcerated at Red Onion State Prison, the most secure in Virginia, known to house the most dangerous of the dangerous. Gleason had just been to court where he pled guilty to the murder of his cellmate Watkins. And in that proceeding, he pled guilty and begged to be executed. And along with begging to be executed, he threatened, he said, if I am not executed, I will kill again. Let's go to the issues in this case here. Yes, sir. You will. We're very familiar with the facts in it. This is an interesting case. I'd like to get to the issues of it. Yes, sir. We believe that the context under which Gleason made these threats made him, and his history also made him, the obvious and dangerous inmate who would kill again. And we believe the issues... Did the defendants in this case, is there any evidence that they knew about that threat to kill again? Yes, there is. What is it? Gleason testified in his deposition that the COs had been advised that they were all told to look at the internet, that they had been coming by his cell laughing about it. Mullins admitted in his deposition that he had been briefed on Gleason in particular. Mead and Halsey are inconsistent in their testimony. They say they're aware of it, and then they also say they weren't aware of specifics. Not just aware of the fact that he had killed his prior cellmate. They were aware that he had threatened to kill again. Mullins admits in his deposition that that's the case. Gleason says they all knew about it and talked with him about it. In addition to the threat to kill again, Gleason was very good at the trading schemes that existed. And his testimony in this case is that, and we are pre-trial here, this is a motion for summary judgment. We believe the court erred in several respects. But Gleason's testimony is that he traded with these defendants, guards Halsey, Mullins, and Mead, and Baird, for the opportunity to get the opportunity to do something to Cooper. We don't contend, and there's no direct evidence that these guards knew what he was going to do, but they participated in the scheme that permitted him to take a weapon to the recreation yard, a braided sheet, and strangle Aaron Cooper. Just a point of clarification because it's so important. So as you read Gleason's deposition testimony, you think he's saying that the guards knew he was going to do something to Cooper? Cooper. He arranged specifically with those guards to have Cooper placed beside him. I saw that, but not necessarily for the purpose of harming him, right? There's no express testimony that I told them I planned to harm him. There's no express testimony he said I planned to harm him. There is testimony that he was to be there because he intended to do something with or about Cooper. And they knew he had the braided sheet in his clothes. Mullins and Mead searched Gleason before taking him out. He had a four-foot braided sheet inside his long-sleeve shirt. I thought the agreement was that they wouldn't search him. It was that they searched him. He describes it as they went through the motions because you hold up a t-shirt or you fiddle with it in a box. You know that it's either the t-shirt or there's something in it. So a four-foot braided sheet Gleason carries and is seen on video. Carrying inside his shirt into the rec yard, Mullins and Mead were both penalized and reprimanded for this event, for failure to properly search Gleason. Is it a matter that Cooper was in a position where he wanted this to happen? He was participatory. I mean, there's an underlying scheme here that's being taken, done to. Does that matter? There are four factors in relation to whether or not he sort of is responsible for himself. The first one is that in the summary judgment motion, none of these defendants allege contributory negligence or participation as a defense. Rule 56 requires that the grounds for summary judgment be laid out in writing specifically. Would there be a defense to an Eighth Amendment violation, which is the underlying violation you allege for a 1983 action? I don't believe it's a defense, but they are. Why would they allege a defense to an Eighth Amendment violation as being contributory negligence? I'm sorry. Contrib is the wrong phrase to use. They did not allege in any of their papers, their moving papers, that his participation of any sort was a ground for their summary judgment motion. But to specifically answer your question, the State They have to. They have to, yes, but they did not. As an affirmative defense, that his contributory negligence was a ground for In the motion for summary judgment, the State did not argue or list as a ground for summary judgment that he participated in the event that led to his death. But in determining whether or not they had a culpable state of mind, you would think that if you've got an inmate here, Cooper, the alleged victim, and his mother's now suing on Cooper's behalf, Cooper's in cahoots with Gleason, who everybody else knows is dangerous and by your own statement, he's told everybody in the world, newspapers, that he's going to kill again, and yet Cooper enters this agreement with him to go through this scheme so that it'll look like, from Cooper's vision, that he's being killed, but Gleason's not supposed to kill him. And yet the inmates are supposed to protect someone and have a culpable state of mind against, as to this whole business, protect someone who's involved in a scheme like this. How do you do it? There are three other reasons. The defendants admit that because of this facility, they have 24-7 visual surveillance on everybody to keep them from harming themselves and harming others. Here, in this situation, Cooper had a mental illness that was untreated. Cooper had been threatened. Gleason says in his testimony specifically, I told him... Cooper would not be the kind of individual who would not have self-preservation instincts. That if someone was coming at him, as it would be, I mean, if you're looking out for inmates, you tend to think that if someone's going to be harmed, you're going to hear commotion or you're going to hear something. Is there any indication that even in his lower mental capacity, as you would say, that he would not have been like any other inmate out there? His mother had been threatened to be murdered by Gleason. Gleason specifically says, I told him if he messed up, I would have someone kill his mother. And that's in Gleason's deposition. So his participation was required, intimidated, et cetera, because Gleason wanted to do it to embarrass the facility. According to what he told Cooper, what he really intended to do was kill Cooper to embarrass the facility even more. And the law officers all knew this, at least from the perspective that it was fatal. From a legal perspective, they did not have to know this. They only needed to know that Gleason was dangerous, he was a homicidal inmate, he intended to kill again, and he said he would kill again, and they give him the opportunity. This could not have happened. They need to know that you've got two cages with two individuals in it, cages separated, and one of them is going to walk over and put himself to the back of it and allow Gleason to put a braided sheet around his neck. Because his mother... They need to know that. They don't have to know that. That is what happened. That is what happened. And that happened because Cooper had a limited capacity and his mother had been threatened if he did not do what Gleason told him to do. And that's a specific threat in Gleason's testimony. So it wouldn't have been just Gleason, any inmate potentially would be subject, would put these officers subject to a 1983 action because of the limited capacity of Cooper to be abused by other inmates. They're all dangerous by definition. Absolutely. So this could have been any inmate. It wasn't so much Gleason. That's right. It didn't have to be Gleason, but Gleason is the one who's in the forefront at this point because he has said, I will kill again. He's a lifer. Cooper is a man with a release date. That's not really that relevant so much because you just said that it's because Cooper has such a diminished capacity to protect himself, I guess, that any inmate could have done this. And they should have been protecting Cooper. Is that your allegation? It's both. They should have been protecting... I want to know about that one. Is that your allegation? My allegation here is that the target that needed to be separated from everybody else is Gleason. Is particularly vulnerable because of his diminished mental capacity and was subject to needing extra protection? Gleason is the target here. From anybody. I know it's Gleason. I'm going to get back to Gleason. But from anybody. Is that the basis for where we are here with these officers? It's both. Because these officers knew that Gleason had the capacity and they gave him the opportunity and the weapon. But they also knew that Cooper was of limited capacity. Cooper had been threatened. And Gleason was the type who could connive these sorts of things. Counsel, it seems like we're... Is it possible this is more complicated than it has to be? I mean, in Farmer v. Frenion, right, the Supreme Court says it doesn't matter if you know who's going to do it or who's going to get it. All you have to know is that if an inmate says to you, I prefer you don't search me today and I prefer you put these four people in these four cages in this order, there's a risk that someone's going to get hurt. There's a serious risk in this case because of Gleason's threats to do just that. And their complicity was essential. Under Farmer, circumstantial evidence may be used. And this court has recently said as much in the McDessie v. Fields case from the Western District of Virginia. That case had even gone through an evidentiary hearing. Here, we're only at summary judgment. This court tossed aside all the testimony of Gleason as, quote, inadequate. But Gleason's testimony was consistent with his claims that these guards participated with him and they knew he was going to do something. Without their complicity, the braided sheet could not have gotten into the rec yard. The hour and 15 minutes of unwatched rec yard from both the tower and anyone else walking out there was connived because it's inconceivable and violated a standing count. What is the specific evidence that you say shows that these officers knew that Gleason posed a danger to Cooper specifically? What is the evidence there? Because he was the person that Gleason insisted be beside him in the cages. Mullins and Meade brought Gleason out first and then brought out the specific people he wanted. That fact alone is sufficient to show that Gleason intended danger to Cooper because he wanted him placed beside him. With a braided sheet, yes. But all the other evidence taken together is more than sufficient circumstantially to show that these officers knew that. Cooper, I'm sorry, Gleason... All of this testimony, all of this comes from Gleason's statement. No, sir. In addition to Gleason's statements, you have the search that didn't find the braided sheet. You have an hour and 15 minutes of no guard looking at the recreation yard. The search that didn't find the braided sheet is based on the fact that it was there. There was no other way for it to get to the cell. It was there. There's no dispute about that and they were disciplined for it. But without anything else, that's negligence. We believe it's... Unless you've got something to say they deliberately didn't search him for it. It doesn't show deliberation. Deliberation is not necessary under Farmer. Only that they were culpable in the sense that the circumstances show they were aware sufficiently that there was a risk. Thank you. Thank you, Ms. Taylor. We'll hear from Mr. Curling-Stout. Good morning. May it please the Court, I'm Henry Curling-Stout and I represent the four defendants who are in this case at this time. Let me first comment that there's no evidence that any one of the four defendants bared Halsey, Meade, or Mullins had any knowledge or were told that Gleason had an intent to kill again. The documentation of that, that statement was made... The evidence that was just pointed to us as being sufficient to show that they posed, he posed a danger, Gleason posed a danger to Cooper. Okay. First of all, I'm saying that there's no evidence that any one of the four defendants were told or advised that Gleason intended to kill again when he got to the prison. An important factor there is that what they all four did know was that prior to the time he came, Gleason came from the... Television, in court, everywhere telling him he was going to kill again. And in fact, hadn't he already tried to do this, done this? He'd already done it. My understanding is that he made that testimony in December of 2010, around five months after this had already been done. I don't see any evidence and there's no... Just because it's on the Internet or on television doesn't mean that Baird, Halsey, Meade, or Mullins saw that. And also the prior... Two things. Also, the prior murder of Watkins had been when Watkins and Gleason were cellmates. In this, in Red Onion, it is in segregated cells to begin with. Sorry, can I stop you there? Doesn't Baird testify in her deposition that out in the country, people are constantly trying to go after each other with implements and weapons and that everybody knows that? So it's not as though the separate cages is sort of sufficient protection. What she said was all kinds of things can happen. She mentioned weapons and implements. She said, and we have had situations where they've tried to get weapons or other things through the cage, yes. So everybody knows there's a risk there. There's a risk there of getting something through. What has not been, what is important to know is that when asked, when Gleason was asked about the rope, he is the one who said, oh, and half of it was in Cooper's pocket. So he's both saying on page 115, J.A. 115, he's saying that the rope was, he talked about the rope and he said, yes, and it was in Cooper's pocket and he was asked, well, why that? Well, because all the men wore them to keep their pants up because when they went they had baggy pants and they put that up. So there he has Cooper with the person who brought the rope and he called it a braided rope at that point. Also it's important that it is true that Meade and Mullins, when they came to the, they admit that what they say is they go anywhere they want to. When they come in, wherever they want to go. But let's accept Gleason. Gleason said, I wanted to be near Cooper. And so they were side by side. So we have the nearness to it. But there's no indication that there was any, there's no indication and no statement by Gleason that Meade and Mullins who brought him into the, that they knew anything about the braided thing. Can I ask you a question? Let me just stop you because I think if you read Gleason's deposition testimony, you sort of draw inferences in favor of the plaintiff as we should now. I understand. These reasonable inferences. I think you can say that Gleason is testifying that these three guards, these three floor guards colluded with him, traded with him so that one, they would not, he said, don't search me and they said, okay, we won't search you. Two, put these people in these cages and possibly three, stay away for a little while. I don't see any testimony saying that he said why he wanted to do that, but he said that. Don't search me today. Put these people, this guy next to me and the other people in the cages as I have ordered and then stay away for an hour. If we credit that testimony, can you prevail here? I mean, if you credit that testimony, isn't that enough to show deliberate indifference? So is your argument that we shouldn't credit the testimony or is it that even credited, that's not deliberate indifference? Even credited, that's not deliberate indifference, that they knew that there's something serious harm was going to happen to Cooper. Well, what's going to happen? They have to know there's a significant risk. I understand that. If an inmate asks you at inmate behest, please don't search me today before you put me next to that guy, how is that not a significant risk? Well, let's see. That might be if you say, please don't search me today. That's the allegation. That's the allegation. The proof, the evidence, I'm sorry. But we're at motion to dismiss. So for you to win, we have to not credit. We have to find a way to say even though this isn't supposed to be a credibility determination, we're just not going to pay attention to that part of the deposition. I guess that's what I'm asking. If we take the deposition as credible testimony at the motion to dismiss stage, how do you win? I win by saying, or we, the defendants win by saying, number one, what is clear is this. They put them together at the request. But there was no indication, there was no, and what's important here, there was no indication that Mead or Mullins saw any, any braided rope. And... That makes it worse. It could have been a knife. They have no idea why they didn't want him to search him. But that's not really, the evidence is not that he said, don't search me. It's that he said, I wasn't searched. I simply threw my... No, no, that's not what it is. It's that by arrangement, and because, as a result of this treating, they didn't search me. That was the arrangement, that they wouldn't search me. That's what he says. He also says, all I did was to throw my clothes out. And they looked through them, but they just didn't see it. He's saying they just didn't see it. So all we need, though, we're at the summer judgment stage, and all we need, though, is an issue of fact to go to the jury here in this instance. And what Judge Harris is posing is that if we view that in a light most favorable... Yes. ...to the non-moving party here, and all we have is that testimony. In viewing it in a light most favorable, why does that not, in and of itself, notwithstanding the other statements by other witnesses here, establish that at least this should go to the jury? Well, if the evidence is that Meade and Mullins never saw or were shown what was in, what was apparently that he was taking out, if it is the case, as it is, that Gleason said it's not, it was in the pocket of Cooper, if there's no indication that they had any sense that he was, I think one of the cases talks about if it's an innocent, innocent thing there, they could say he's gone out and he can talk to the people. He just wanted to be next to him. They just wanted to be next to each other. There was no indication, you know, okay, you can have those facts as they are. I don't think it, I don't think the proper inference, though, is that they just decided to hide. It was lunchtime, anyhow. Just get away from there. Here's the testimony. Yes. He says they skipped over it, they skipped over the rope, and they were doing that because of your agreement that you would stay in and do other favors for them. And he says yes. Okay. So as I, I don't see any way to read this other than testimony, and maybe we don't credit him, but put that to one side, testimony, that they colluded with the inmate. He said don't search me, and they didn't do it as a result of their agreement. If you go, it's also stated by Gleason when he was asked, well, what is it that you would get in return? What is it that you would get in return? And he said, well, I wouldn't have to get out of my cell to go to, I could not go to rec, and I could not go to showers, or I could get tobacco. Then he was asked anything else. He said, well, I won't get into that. Well, why isn't that enough? Those are the three favors that he did them in exchange for not searching him. How many favors do there have to be? Three isn't enough? No. Not going, he doesn't go to his cell, he doesn't leave his cell. Doesn't leave his cell, which makes it easier for the guards, doesn't shower, it's easier for the guards, and they give him tobacco. What does that have to do with the, what, what the argument has to be is that they were saying, okay, in return for you getting Gleason, me, and Cooper side-by-side, I'm going to, I'm going to kill him. It, you know, I can't, the only, the only response, quid pro quo, for Gleason was that he was going to, not coming out. In other words, he said, if you do favors, the favor is going to be the cookies. If you give him cookies, that was what the main thing was, at the start of the day, if you give somebody cookies, then the response is no shower and no getting out of the, no getting out to the rec. I don't see where he said any, and he was asked, what are the, what do you get in return? I get that, and I get a thing of tobacco. There's never any indication, I mean, you've got to know who these officers were, where's the, I mean, it has to be significant evidence, has to be significant that they knew, goodness, if they put these two together, there was some history, and in fact, Gleason talked about how he had, there was something about segregation of the, oh, that, oh, I'll kill someone, that was of other people, not these good defendants, as to whom there was this conversation, and maybe something else is going to happen over there. That's nothing that made its way to these defendants. What is the test here, subjective or objective? Well, there's both an objective and a subjective test, and the subjective test is what they knew, that they knew this was going to happen, very well knew that this was a big risk, and they didn't know anything about it, and it has to be significant evidence, the, it has to be significant evidence, assertions of what the jury might or could disbelieve, defendant's denial is not sufficient, assertions or denials without evidence is not enough, and it has to be specific, significant, affirmative, probative, and evidence. Well, in, in the first case, let's assume the guards knew about the killing by the inmate. If I, if I recall the record, there was animus between he and his cellmate, and they didn't get along. In this case, there's no evidence that these two people had any animus between each other. In fact, they got along. Correct. And so, how would that lead the guards to subjectively believe that something bad is going to happen to this guy? I don't think there's any way at all, I think that's what's missing in the whole case. I mean, yes, they put them together, but there was no, there was no knowledge, no way, it was, the cases talk about the elements, the quantity and quality, I'll say, of the evidence itself. And they had no, yes, they put the two together, that's what we have. They put the two together, they knew that everybody in the, in the prison was dangerous, including Cooper and all the other inmates would be dangerous. There's, they're in a, he's in cell, in the pod, to a segregated cage. No one had ever been killed in the cage. It wasn't a situation like, well, somebody's already been killed in the cell. But people had tried, right? That's what the bear testifies. Not to kill. Well, that the inmates try to use weapons on each other, maybe they just mean to wound. No, no, no, there's no, with all due respect, there's, there's not any, there's not, Baird didn't say, oh, yes, and they tried to get this through to kill somebody, they just said, and on occasion we've had them trying to get, trying to get things through, through the cage. Okay. Okay. And not necessarily that they tried to get it through. Well, that doesn't mean they did. That's, and if we're talking about four defendants, maybe that's what Baird knows, but there's everybody knows. She says all the guards know that out in the rec yards people try to use weapons and implements against each other. That's what she says. Well, my understanding is she said, you know, the feces and all like that, anything can be tried. But that doesn't mean that these officers knew that that was a risk that this fellow Cooper was going to get killed. I keep coming back to the part in Farmer versus, the Farmer case where they say it doesn't really matter whether they know who's going to do the attacking or who will do the attacking. What matters is the risk of an attack. And I'm wondering whether you can point me to any case, is there any case where the facts are, as they are alleged here, that guards fail to do a search that is required by prison protocol as a matter of safety. They intentionally don't do the search because the inmate asks them not to. Then the inmate uses a weapon. He was therefore able to get into the particular place to kill someone. Is there any case like that where a court says that's not deliberate indifference? Your failure to abide by prison protocol, adhere to prison safety rules at the request of an inmate is not deliberate indifference. I do not know of a case of that right now. But I also, I'm sorry. I looked. I couldn't find one. I've not seen one. But also we are assuming in your question. I'm assuming what I'm reading basically from the testimony. I understand. But I don't see any evidence of what the rules of the jail were as to, I know what they did, but what the rules and that there was a breach of jail rules. I don't see any evidence, any jail rule in the joint appendix that says that's the requirement. What I see is two officers who are accustomed to, okay, where do you want to go? You want to go there, there? Okay. Well, go on. You two stay over there. I'm talking about the search. But beyond that. The failure to search, not the placement. I'm sort of focused on the part where it is at least alleged that as a matter of agreement they agreed not to search him. You see, I just see the facts a bit differently. I see it that he said, he was, the question was, were you searched? Oh, no. I just took my stuff and threw it out there. Well, let me ask you. And they didn't see it. It seems the case boils down, I don't know how I'm going to answer this question. But is it really a reasonable inference that Gleason was trading in order to have a chance to kill Cooper? No. And the guard should have known that? No. The closest it could be was that he wanted to get there either to talk to him or, you know, it's an innocent, where's the indication in this evidence that when they let them both be together, they had, he had been there, they had been there in the same pod for months. There was no indication, I'm sorry. I'm reading your best argument is that there's a general risk here, can be established, but the specific of attacking Cooper or danger to Cooper has not been established by the evidence. But what about Halsey? Halsey is alleged, at least is stated by Gleason's deposition, to be in a control room and seeing Gleason with this rope and turns a blind eye to it. How is that not different, at least from the other three? That is the more complicated. I'll agree with you there. More complicated meaning the one that if it's going to go to the jury, that one you probably would say has to go. No, no, I'm not saying that. I'm just saying when you look at it, you say, oh, well, what do they say? I came out and I looked up there and I pulled the thing out and she had to see it. Now, what proof is that that she saw it? I pulled the thing out and she had to see it. Clear as day, she had to see it. Her response was, okay, that's what he's saying that he did. But the problem is she had to see it. That's no indication that she saw it. Plus she's in, allegedly, in the control room, at least for the break. The interesting thing is there's no suit against the person who was in the control room, and the allegation of Gleason is that that's who had the responsibility was the people in the control room. Well, Gleason said it was Halsey in that control room. Oh, that's right. That is correct. That's what we've got to take as true on summary judgment. You've also got to take as true that he said the reason I wanted the cage that I did was because I knew how the camera was focused. And that's as far as he went. Meade and or Mullins said, went through that and said, you can't see in that part of the cage. You cannot see anything from the, it wasn't, I think, the control tower, anywhere else. You cannot see anything but the feet. So the most that Halsey could have seen, even if in the control room up there, was feet. And he does not dispute that. And, in fact, he corroborates that by saying I chose that cage because I knew how the camera was focused. And the indication as to Halsey, and then another thing is when you're talking about what rope we're talking about, I don't see how Gleason gets out, I mean, I don't see how we get out of the testimony of Gleason that he, in being asked on JA-115 about the rope, said, oh, well, half of it was in, it was in Cooper's pocket. Well, that puts the whole issue of where did it come from in Cooper's pocket such that it wasn't shown. And that's. Your time is up. We appreciate your time. Thank you. Ms. Tate, you have a few minutes. Thank you, Judge. Judges, we believe that Farmer applied here, makes it clear that there is sufficient circumstantial evidence for this case to go to the jury. Farmer specifically said that the requisite culpability, deliberate indifference, including risk, knowledge of risk, knowledge of serious risk may be proved by circumstantial evidence. But it can't be a general risk. It has to be specific to some extent, even under Farmer. Yes, sir. And it is specific here because of. . . a cage next to each other, which is, it's not like they put them in the same room. They put them in two different cages. There's a wall that separates them. So the fact that you put them in cages doesn't mean he's accessible. But I understand that you put them in cages, and with the diminished capacity aspect of it, you say that sort of leads to that. And when you connect those dots with the fact they didn't search him, and he says they didn't search him deliberately, and he has on him this rope or this braided sheet that the lawyer on the other side says is used like a belt sometimes by inmates. Your Honor, there's some confusion about the pants and the rope, and I'll get to that. But to your more specific. . . I think that's obvious for the record. You're talking about a different type of rope from what's here. Separate in his pants, not a part of the strangulation. But there's a reason here, and Gleason specifically says there was biracial animus toward Mr. Cooper because he was biracial. He was African American and Caucasian. And Gleason specifically says that feeling facilitated my scheme because they knew Cooper was going to be a part of something that Gleason had planned. Gleason said he had already planned to do someone else before he came, decided to go to Cooper. And he changed. Take it Mr. Cooper's, in sort of an awkward way, if the suit goes forward, he sort of got what he wanted. He wanted a lawsuit, albeit he didn't want it by his mother, but he's got a lawsuit out of this thing from his action. That was a part of Gleason's thinking in getting him into this. But ultimately. . . We've got to accept Gleason said that too, that Cooper knew what he was doing. I mean, we can't give Cooper diminished capacity on one aspect of it and then not on the other aspect of it. I mean, we've got to accept something here. Well, I think the diminished capacity factor is he did not perceive that Gleason was capable of murdering him and was going to do whatever Gleason said, which was try to embarrass the facility. That was Gleason's scheme. But there's no evidence that Cooper had the capacity to evaluate Gleason being after him. But Cooper was also acting in the way to be complicit because Gleason had threatened to kill his mother. And that came from, that testimony is from? It's from Gleason's deposition. On page 112 and again on page 122, I told him I would kill his mother if he messed up. Why would you tell him about the soup then? I mean, why is that in there? I mean, if that's the whole basis. . . I think that's part of the connivance to get him to cooperate. He can connive him. He can coerce him because he's diminished capacity. Why would Gleason. . . I understand Gleason's not exactly the kind of witness who's going to be a great deposition to read if it's going to trial. I mean, I think even if you get him here, you've got a difficult case to win just if it's based primarily on Gleason's testimony. But I'm trying to connect in at least the three officers here. But tell me about Halsey because I think Halsey. . . Halsey is part of the initial scheme to put Cooper in the right cage. Is there evidence that Gleason has the ability to see her in that control? Yes, yes, you can see her. Other than just her feet? Oh, yes. In the answer of defendants, they admit that from that guard window, you can see the entire cage section. From where Gleason was? From where Gleason was, yes. They admit that in the answer. But then even Officer Mullins, who says you could only see their feet, says two different things. Also in Mullins' testimony, he says, well, yeah, you could see all the way back in there. You could see if you were in the window. So Mullins' inconsistencies are an issue here, and the court credits only the part that would have supported summary judgment of Mullins' testimony. But you can see. As to Halsey. . . And Halsey says, Gleason said Halsey sees him with the rope, turns a blind eye. Exactly. What does he say she does? Does he turn around or is it his conclusion? He says she closes the window and leaves and is never seen again. She's the person who's supposed to be taking. . . Does he indicate when he says she sees the rope, does she go like, you know, I see the rope? Or he just takes it from a conclusion that because she's looking in a direction, she sees the rope? He says that she sees it because he holds it like this. How does he know she sees it? He testifies that he is looking at her and she sees him with the rope. How does he know she's seeing him other than if you're looking in a direction. . . Because he sees her. He sees her looking at him. So his best testimony would be he should have seen her. His testimony is I saw her, and she was looking at me, and when I shook this rope at her, she then saw it, put the window down, and left and never came back to the window even though she was taking the break. But she also says, I don't remember it. Now, how incredulous. An inmate like Gleason shakes a break. . . Is it incredulous that you would believe an officer over Gleason saying she shook a rope? After the scheme he described, yes. She would know. That never happened. That's why I'm saying. . . This is the same Gleason that's killing inmates all over the place and is in here and taking a rope, and it's incredulous to believe this officer said that she didn't see it. No, no, no. She never said. She never denied. That's my point. She said, I don't remember. I don't recall. That's why I'm saying it's incredulous that if Gleason is shaking a rope, you could say, I see it, or no, that never happened. That's why it's incredulous as to Halsey. One quick question before we let you sit down. I very much understand your case as it relates to the three floor guards, but how is Sergeant Baird implicated in any of this? There's no allegation that she was part of the trading and the collusion to sort of create this space for trouble, right? Gleason says she participated, and Gleason also says that she would have been the person to go by during lunch or whatever. It was her job to be sure somebody was in the control room. Nobody was. And she was reprimanded. She was disciplined. Right. So I understand sort of the allegations that there was, she messed up. Maybe that was negligence. But I'm not seeing the allegations that you have with respect to the floor guards that there was sort of a collusion, an agreement. Okay, we won't search you. Okay, we'll put these people next to you. There's nothing like that with respect to. We only have Gleason saying that directly he made some sort of deal with Baird. We don't have Baird communicating with the other three. But we do have the other three communicating with Gleason about the lineup and who comes to the cages. Right, right, right. So it seems to me that Baird is somewhat differently situated. Yes. And she does say on page 191 that dangerous behavior, long-standing risk of the rec yard, including weapons and that sort of thing was well known, and it happened. So we believe that if you look at Farmer, there was not a need to specifically note that Cooper was the victim. There was not a need to prove that he would be killed. There was not a need to go to that inth, so to speak. But applying Farmer here, we believe the court erred in granting summary judgment because the court failed to credit Gleason at all and simply called Gleason inadequate to support the case. Gleason's testimony is consistent with all the events that happened. I'm sorry, can I just have one question. I'm sorry, you read the district court as saying I'm not crediting testimony. I read the district court as saying I'll credit it and it's not enough. The district court credits the guards who disagree with Gleason without acknowledging there's a dispute, and the court says his testimony is the sole basis for the case and it's inadequate. That's incorrect, we believe. But it's not that he says I don't believe the testimony. He's saying I'll take the testimony as it is and it's not enough. Well, in some situations he is saying I don't accept Gleason's testimony as to these facts, especially the agreement itself. He's dismissing Gleason's testimony in my reading of the case. He also did not credit Mullins or the answer of defendants to the effect that you could see into the cages. And the district court did not apply the maxim from the Charbonnage case that where state of mind is an element of a claim or a defense, summary judgment is seldom appropriate as here. And we believe the circumstantial evidence and the concrete evidence, the braid going out, the cage placement, the absence from the tower. All right, your time is up. That's it. Thank you and your presentation. Thank you very much. The court will come down and greet counsel and proceed to the next case.
judges: James A. Wynn Jr., Henry F. Floyd, Pamela A. Harris